## 30644. STREET v. THE STATE.

UNDERCOFLER, Presiding Justice.

The appellant, George Street, was indicted by the Pierce County Grand Jury for murder and armed robbery occurring on October 14, 1974. Following a trial by jury from December 16, 1974, to December 19, 1974, the appellant was convicted on both counts and sentenced to death for murder and life for armed robbery. The case is here on appeal and for review of the death sentence imposed.

### I. Summary of the Evidence.

On the morning of October 14, 1974, the appellant's common-law wife, Ruby Taylor, went into labor and was taken to the Pierce County Hospital for delivery. The hospital policy required that before a patient could be transferred from the emergency room (treatment room) into the hospital, proper arrangements had to be made to cover the hospital expense.

The appellant was seen at the hospital at 6:30 a.m., 9:00-9:30 p.m., and again at 2:00-2:30 p.m. on October 14, 1974. On the latter occasion, the appellant was noticed to have a bandage wrapped around two fingers of his left hand. He also paid $29.00 on the hospital bill of Ruby Taylor.

Mr. M. B. "Red" Herrin, the victim, drove a school bus and operated a taxi service. Herrin's unattended cab was first noticed at 12:30 p.m. A subsequent search for the victim resulted in finding his body, with his throat cut and fourteen other stab wounds, placed head first in an old well behind an abandoned house. There were numerous blood stains in the cab and around the house where the crime occurred.

The appellant had been seen in the victim's cab.

The appellant was subsequently apprehended and after being advised of his constitutional rights he made a statement, in summary as follows:

After leaving the hospital, and before lunch, the appellant contacted Mr. Herrin to drive him to his mother-in-law's home. When they arrived at her home, the appellant stayed for a few minutes before returning to the taxi. Mr. Herrin then drove him back into town where

Street attempted to telephone his mother, who did not answer the phone. The appellant then had Mr. Herrin return him to his mother-in-law's home, and thereafter drive him back into town where he again tried unsuccessfully to call his mother. At that point, Mr. Herrin informed the appellant that his fare was now $38. The appellant knew he had only $20 so he instructed Mr. Herrin to drive him to his brother-in-law's where he would get the money. He directed Mr. Herrin to the abandoned house under the pretense that his brother-in-law resided there. When they arrived at the house the appellant went inside, returned and told Mr. Herrin that his brother-in-law had apparently moved. Mr. Herrin then informed Street that he must pay the fare or he would take him to the sheriff. The appellant stated that he was not going to the sheriff's office, at which time Mr. Herrin got out of the taxi and they started tussling. The appellant drew his hawk bill knife and slashed Mr. Herrin. He then ran into the house followed by Mr. Herrin. The appellant ran through the house and circled behind Mr. Herrin. Mr. Herrin continued through the house and went over near the well and as he turned, George Street pushed him head first into the well. The appellant then ran to the taxi and drove it back into Blackshear where he abandoned it.

Personal items belonging to the victim, including a billfold and a watch that appellant had been seen wearing were found in a search of the house where the appellant was living as well as the murder weapon, a hawk bill knife.

An autopsy revealed that Mr. Herrin suffered numerous knife wounds. The cause of death was multiple deep knife wounds and drowning.

## II. Enumerations of Error.

1. In Enumeration 1 the appellant alleges the court erred in overruling his motion for change of venue.

The grounds of the motion were extensive adverse pre-trial publicity making a fair trial in the county or surrounding counties unobtainable, and danger of violence to the defendant.

We note there was no violence toward the appellant during the trial. That much of the ground for change of

venue is moot.

The appellant based his motion on news articles in the Blackshear Times on October 17, 1974, October 24, 1974, and November 14, 1974, and the Waycross Journal Herald on October 17, 19, and 24, and November 11, 1974.

Long-time residents of the county, called by the state, testified that they believed the appellant could get a fair trial in the county.

The resulting prejudice alleged by the appellant is, "During the jury selection procedure at the trial itself on December 16, 1974, a juror, Mrs. J. P. Knowlton, indicated that she had a fixed opinion as to the guilt of the appellant. (Tr. 2) Although it is not reflected in the record, numerous jurors indicated on voir dire that they were acquainted with the facts of the case either through having read about it in the newspaper or some other means."

We note that the juror, Mrs. J. P. Knowlton, was not considered until after twelve jurors and the first alternate had been selected. She was then excused by the defense. There is no indication of how this could have prejudiced the appellant.

In *Jarrell v. State,* 234 Ga. 410, 415 (216 SE2d 258) (1975) this court held, ". . . the grant or denial of motions for change of venue in criminal cases lies largely within the discretion of the trial judge. The exercise of that discretion will not be reversed on appeal unless it is made to appear that there has been an abuse of discretion. . . " citing *Anderson v. State,* 222 Ga. 561 (150 SE2d 638) (1966) and cits. No abuse of discretion is demonstrated here. Code Ann. § 27-1101.

Although we are satisfied that the trial court did not err under Georgia law, the increasing coverage of criminal matters by the news media and the attendant litigation justifies an examination of the standards developed by the Supreme Court of the United States under the Due Process Clause of the Fourteenth Amendment and the right to trial by jury under the United States Constitution.

In Marshall v. United States, 360 U. S. 310 (1959), a case involving conviction in federal court, the Supreme Court of the United States held that the harm to the

petitioner that resulted when prejudicial information denied admission into evidence was brought before the jurors through newspapers (during the trial) requires a new trial be granted. The Marshall decision was based on the court's supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts. In Murphy v. Florida, 421 U. S. 794, 798 (95 SC 2031, 44 LE2d 589) (1975) the court held, "We cannot agree that Marshall has any application beyond the federal courts."

Likewise, we must conclude that the recent case of United States v. Williams, 523 F2d 1203 (5th Cir., 1975), involving a conviction in federal court was based on an application of those standards for enforcement of the criminal law in the federal courts.

The cases pertinent to the due process standards for state trials have been placed in perspective by the United States Supreme Court in Murphy v. Florida, supra. The court there held that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged do not *alone* presumptively deprive the defendant of due process. The court distinguishes its recent cases dealing with state court convictions.

In Irvin v. Dowd, 366 U. S. 717 (81 SC 1639, 6 LE2d 751) (1961) eight of the twelve jurors who tried the case had formed an opinion that the defendant was guilty before the trial began. The court there found actual prejudice to a degree that rendered a fair trial impossible.

In Rideau v. Louisiana, 373 U. S. 723 (83 SC 1417, 10 LE2d 663) (1963) the court held it was a denial of due process of law to refuse a request for a change of venue after the people of the parish had been exposed repeatedly (3 times on television) and in depth to the spectacle of the petitioner personally confessing in detail to the crimes with which he was later to be charged.

In Estes v. Texas, 381 U. S. 532 (85 SC 1628, 14 LE2d 543) (1966), and Sheppard v. Maxwell, 384 U. S. 333 (86 SC 1507, 16 LE2d 600) (1966) the news media saturated the surrounding community with publications, inundated the courtroom with their presence and activity,

and created a "carnival atmosphere" of the trials.

In each of these cases the Supreme Court of the United States overturned the state court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage.

From Murphy, supra, we conclude that under the decisions of the Supreme Court of the United States, to find that the petitioner did not receive a fair trial, petitioner must show (1) that the setting of the trial was inherently prejudicial or (2) that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.

The appellant Street has shown neither.

We conclude that the trial court did not err under either Georgia or federal law in denying the motion for change of venue.

Likewise appellant's Enumeration 3 that the court erred in refusing to excuse a juror who stated that she had a preformed opinion as to the guilt or innocence of the appellant is without merit.

2. In Enumeration 2 the appellant alleges the court erred in overruling the appellant's objection to the qualification by the state of the jury as to opposition to capital punishment, and in Enumeration 39 the appellant alleges the court erred in correcting the transcript relative to the voir dire examination of jurors as to their opposition to capital punishment by post-trial proceeding.

These enumerations present the same issues recently considered by this court in *Davis v. State,* 236 Ga. 804, 807 (225 SE2d 241). We there recited that, "In *Owens v. State,* 233 Ga. 869 (214 SE2d 173) (1975) we limited the power of the trial court to supplement the trial transcript pursuant to Code Ann. § 6-805 in the absence of a transcription of the voir dire examination by the reporter. We permitted supplementing the trial transcript in *Coker v. State,* 234 Ga. 555 (216 SE2d 782) (1975) only to the extent of establishing that no jurors had been excused for conscientious objection to capital punishment after appellant in that case had asserted in his brief that a number of prospective jurors had been excused on this ground."

Attached to the record in the case of George Street is a hearing on motion for new trial and motion to correct transcript. At the hearing testimony was heard concerning the voir dire examination of a jury panel member for conscientious scruples against imposition of the death penalty. At the same hearing the record of the superior court clerk of the jury list used in selecting jury in the case of State v. George Street, December Term, 1974, with annotations by the clerk indicating excuse by the court, by the state, or by the defense, was used and attached to the trial court's order without objection. This constitutes an official record of the reasons for excuse. From that record we can determine that one juror was probably improperly excused and it is unnecessary for us to consider the substance of the order of the trial court supplementing the record or the record of the hearing for that purpose or the trial judge's authority to do so under Code Ann. § 6-805.

Although the appellant's objection to the qualification by the state of the jury as to opposition to capital punishment is not meritorious, nevertheless the reporter's transcript is silent concerning excuse of this juror and we are unable to determine if the examination was adequate under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), as amplified in Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433) (1968), and Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221) (1970). In *Davis v. State,* supra, we considered whether the excuse of one juror who was excused without making it unmistakably clear that she would vote against the death penalty regardless of what transpired at trial or that her attitude on the death penalty would prevent her from impartially passing on the issue of guilt, or that she would not subordinate her personal feelings on the death penalty to her oath as a juror to obey the law of the state as charged by the trial court required that the death penalty had to be set aside under Witherspoon, Boulden, and Maxwell, supra, and determined that it was not required so long as the jury was not "organized to return a verdict of death," the decision whether a man deserves to live or die was not made "on scales that are deliberately tipped toward death," and the

state has not "stacked the deck against the petitioner." We find no indication of such a situation here.

These enumerations are without merit.

3. Enumerations 5, 6, 7, 8, 10, 12, 13, 14, 15, 16, 18, 19, 20, 24, 25, 30, and 32 were not argued on appeal. Although normally under Rule 18 (c) (2) Supreme Court of Georgia, those enumerations would be considered abandoned, we have nevertheless, in view of the death sentence imposed, examined each of these enumerations and find them to be without substance or merit. We have also examined Enumerations 9, 17, 26, 27, 28, 29, and 31 and find them to be without foundation in the record or matters within the sound discretion of the trial judge for which no abuse of his discretion is shown. *Moore v. State,* 221 Ga. 636 (146 SE2d 895) (1966); *Gravitt v. State,* 220 Ga. 781 (141 SE2d 893) (1965); *Butler v. State,* 226 Ga. 56 (172 SE2d 399) (1970); *Tanner v. State,* 228 Ga. 829 (188 SE2d 512) (1972); *Davis v. State,* 230 Ga. 902 (199 SE2d 779) (1973); *Crowder v. State,* 233 Ga. 789 (213 SE2d 620) (1975).

4. In Enumeration 4 the appellant alleges, "The court erred in overruling appellant's motion to suppress his purported confession to the crime."

In a hearing on the appellant's motion to suppress the court heard testimony and considered documentary evidence from both sides equivalent to a Jackson-Denno hearing (Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908, 1 ALR3d 1206) (1963)). There was a conflict in the evidence as to whether he exercised his constitutional right to have a lawyer present or whether he waived such right. The evidence was sufficient to support the finding of the trial judge that the statement was made freely and voluntarily after the defendant had been advised at least twice (once by a Justice of the Peace) of all of his constitutional rights as provided in Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694, 10 ALR3d 974) (1965)); *Wilson v. State,* 229 Ga. 395 (191 SE2d 783) (1972); *Brown v. State,* 233 Ga. 171 (210 SE2d 706) (1974).

The trial judge did not err in overruling the motion to suppress or in admitting the statement of the defendant in evidence.

5. Enumerations 11, 21, 22, and 40 were not argued

on appeal and normally would be considered abandoned. (Rule 18 (c) (2) Supreme Court.) However, in view of the death sentence imposed, we have examined each of these enumerations and find them to be without substance or merit.

6. In Enumeration 23 the appellant alleges the court erred in admitting State's Exhibit 28 into evidence over the objection of the appellant.

The essence of appellant's argument here is that Exhibit 28 (a photograph) showing a portion of the trail through the house of what appears in the photo to be a red liquid substance was inadmissible. Testimony of the appellant was that this was the route taken by the victim after he had been cut by the appellant in the front yard and in fact had been retraced by the victim. The exhibit was relevant and material and the trial court did not err in its admission.

7. In Enumerations 33, 34, and 35, the appellant alleges that the court erred in overruling appellant's motions for mistrial or in permitting the district attorney to argue prejudicial matter to the jury when, during the state's argument on sentence, the district attorney argued:

[After relating the heinous facts of the crime], "You think of it, and if Red's spirit is still here, you tell Red's spirit it wasn't so bad; that this fellow must have had something good in him; that he's entitled to life. Look back over and tell Red's family this fellow has got some good in him; that it was all a mistake; that he didn't mean to hurt Red." (After motion for mistrial was made the trial court admonished the district attorney, "Just don't mention the family any more. Just talk about the case and the defendant and the crime," and overruled the motion.)

"To go into the law just a little bit, may it please the Court, we have the death penalty for the most horrible crimes, these horrible crimes such as aircraft hi-jacking, murder, armed robbery, rape . . ." and, "In one of our very famous cases, Hawkins versus the State, 25 Ga. 207, may it please the Court, the language used by the learned Justice says: 'Human life is sacrificed at this day, throughout the land, with more indifference than the life of a dog, especially if it be a good dog.' "

The timely action of the trial judge in admonishing counsel to, "Just don't mention the family anymore" removed any possible prejudicial effect of that remark. See *Coker v. State,* supra, p. 569, and cits. All of the remarks here were made during the sentence phase of the trial. A prosecutor may argue for a death sentence and offer plausible reasons for his position. *Allen v. State,* 187 Ga. 178, 182 (200 SE 109) (1938); *Strickland v. State,* 209 Ga. 675 (2) (75 SE2d 6) (1953); *Chenault v. State,* 234 Ga. 216 (215 SE2d 223) (1975). The district attorney may urge severe punishment. *Bailey v. State,* 153 Ga. 413 (4) (112 SE 453) (1922); *Hamilton v. State,* 131 Ga. App. 69, 70 (205 SE2d 24) (1974).

The record does not reflect a manifest abuse of discretion in overruling the motion for mistrial requiring reversal by this court.

8. In Enumeration 36 the appellant alleges the court erred in overruling the appellant's motion to quash.

The purpose of the motion to quash was that the court should declare the laws of Georgia defining the crime of murder and providing the punishment of death therefor as unconstitutional as applied to the defendant in this case and per se.

Every issue raised herein has been raised in earlier cases coming before this court beginning with *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974) and in each instance the constitutionality of these Georgia laws has been upheld. Nothing presented here convinces us that the statutes should be overturned.

9. In Enumeration 37 the appellant alleges that the court erred in overruling the appellant's motion for discovery and to compel disclosure.

Appellant's motion was a wide-ranging motion, although in argument to the trial court only evidence favorable to the defense was requested. The state promised to furnish laboratory reports to the defense as soon as they obtained them.

Appellant has not shown how his case might be helped or materially prejudiced by other specific evidence in the hands of the state.

There is no Georgia statute or rule of practice which requires discovery in criminal cases. See *Pass v. State,* 227

Ga. 730 (12) (182 SE2d 779) (1971).

The appellant puts reliance on Brady v. Maryland, 377 U. S. 83 (33 SC 1194, 10 LE2d 215) (1963). In *Hicks v. State,* 232 Ga. 393, 396 (207 SE2d 30) (1974) we held: "Brady does not require the prosecution to open its file for general inspection by the defense or for pre-trial discovery. See also United States v. Moore, 439 F2d 1107 (Sixth Cir., 1971). . . The appellant has the burden of showing how his case has been materially prejudiced, even when the trial court declines to make an in camera inspection. See United States v. Harris, 458 F2d 670, 677 (Fifth Cir., 1972)." See also *Whitlock v. State,* 230 Ga. 700 (198 SE2d 865) (1973), and *Wanzer v. State,* 232 Ga. 523 (8) (207 SE2d 466) (1974).

This enumeration is without merit.

10. In Enumeration 38 the appellant alleges, "The court erred in overruling the appellant's motion for new trial as amended, especially that portion which alleged that counsel for appellant did not challenge the array of the grand and traverse juries prior to trial and that this should have been done."

Appellant made no timely challenge to the array of either the grand or traverse juries. In order for a challenge to the array of the grand jurors "to be entertained by the trial court, it must be made prior to the return of the indictment or the defendant must show that he had no knowledge, either actual or constructive, of such alleged illegal composition of the grand jury prior to the time the indictment was returned; otherwise, the objection is deemed to be waived. *Estes v. State,* 232 Ga. 703, 708 (208 SE2d 806) (1974). Accord, *McHan v. State,* 232 Ga. 470, 471 (2) (207 SE2d 457) (1974); *Simmons v. State,* 226 Ga. 110, 111 (172 SE2d 680) (1970); *Williams v. State,* 210 Ga. 665, 667 (82 SE2d 217) (1954)." *Sanders v. State,* 235 Ga. 425, 426 (219 SE2d 768) (1975). No such showing was made in this case and this ground was not urged until after trial and conviction. In order for a challenge to the array of the traverse jurors to be entertained by the trial court, it must be made at the time the jury is put upon him. "The procedure in this state has long required a criminal defendant to raise a challenge to the jury lists at the time the jury is 'put upon him' or else he waives his right to

object. See *Williams v. State,* 210 Ga. 665, 667 (82 SE2d 217) (1954); *Hill v. Stynchcombe,* 225 Ga. 122, 127 (166 SE2d 729) (1969). The legal policy upon which this salutary rule rests is that an accused cannot sit back and gamble upon the verdict and then, if dissatisfied, complain of the jury's selection process for the first time after he has been convicted." *Young v. State,* 232 Ga. 285, 286 (206 SE2d 439) (1974).

The appellant offered no evidence in support of his allegations.

This enumeration is without merit.

11. In supplemental Enumerations 41 and 42 the appellant alleges that the trial court erred in not limiting the jury instructions to those required by Code Ann. § 27-2503 (b) (Ga. L. 1974, pp. 352, 357) and in failing to give the jury written instructions on mitigating circumstances or mercy. The trial judge gave a full and complete instruction on mitigating and aggravating circumstances. He gave the jury written instructions on aggravating circumstances raised by the evidence as a guide for their possible findings as required by Code Ann. § 27-2534.1 (c).

These enumerations are without merit.

12. In supplemental Enumeration 43 the appellant alleges, "The court erred in failing to properly instruct the jury in the presentencing stage so as to insure that if a life can be constitutionally taken as punishment for a crime, that the life will only be taken under the full and exact requirements of the law as is required by the due process clause of the Fourteenth Amendment of the United States Constitution and Art. I, Sec. I, Par. III of the Constitution of Georgia."

We believe the trial court's instruction to the jury did comply with the full and exact requirements of the cited provisions of the United States and Georgia Constitutions. This enumeration is without merit.

III. Sentence Review.

In our sentence review we have considered the aggravating circumstances found by the jury and the evidence concerning the crime introduced in court.

We have reviewed the sentence as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537 (c) (1-3)), as we

did in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974), and in each subsequent case involving the death penalty under this statute. We conclude that the sentence of death imposed here was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the jury's finding of the following statutory aggravating circumstances.

1. The offense of murder was committed while the appellant was engaged in another capital felony (Code Ann. § 27-2534.1 (b) (2)) and:

2. The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery of the victim. Code Ann. § 27-2534.1 (b) (7).

We have compared the evidence and sentence in this case with similar cases contained in the appendix attached to this opinion. George Street's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Gunter, J., who dissents.*

ARGUED JANUARY 20, 1976 — DECIDED JULY 9, 1976 —
REHEARING DENIED JULY 22, 1976.

*E. Kontz Bennett, Jr., Dennis J. Strickland,* for appellant.

*Dewey Hayes, District Attorney, Dean Strickland, Assistant District Attorney, Arthur K. Bolton, Attorney General, Kirby G. Atkinson, Staff Assistant Attorney General,* for appellee.

APPENDIX.

Similar cases considered by the court: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657) (1970); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970); *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213

SE2d 829) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1975); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State,* 236 Ga. 339 (223 SE2d 703) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976).

GUNTER, Justice, dissenting.

The Supreme Court of the United States has just held that Georgia's statutory provisions for the imposition of the death penalty in murder cases are not violative of the Constitution of the United States. Gregg v. Georgia, 44 USLW 5230, decided July 2, 1976. Although I disagree with the construction of the Federal Constitution as construed by seven members of the United States Supreme Court in Gregg, I am nevertheless, as a member of the Georgia Supreme Court, bound by that construction of federal law. However, the Gregg decision by the United States Supreme Court does not in any way prevent or bridle me as a member of the highest court of this state from construing the provisions of the Georgia Constitution.

Laying the Federal Constitution entirely aside, it is my view that Georgia's current statutory provisions that permit the imposition of the death penalty in certain specified cases are unconstitutional; they violate the Georgia Constitution. I would therefore hold that the imposition of the death penalty in the instant case is constitutionally impermissible.

Cruel and unusual punishment

Georgia's Constitution provides that "cruel and unusual punishment" shall not be inflicted upon a citizen convicted of a crime against the state.

Prior to 1972, no court in this nation to my knowledge had ruled that the imposition and carrying out of the death penalty constituted cruel and unusual punishment in the constitutional sense.[1] On June 29, 1972, the Supreme Court of the United States said: "The Court

---

[1]People v. Anderson, 6 Cal. 3d 628 (493 P2d 880) (1972).

holds that the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." Furman v. Georgia, 408 U. S. 238. Five members of that court filed concurring opinions, and as I interpreted those concurring opinions, the imposition of the death penalty under a "discretionary system" constituted cruel and unusual punishment in violation of the constitutional proscription, but the imposition of the death penalty under a "mandatory system" did not constitute cruel and unusual punishment in violation of the constitutional proscription. I said exactly that in the concurring part of my opinion in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974): "I would therefore hold that the current Georgia statutes authorizing the imposition of the death penalty have created a 'discretionary system' as opposed to a 'mandatory system' for imposing this ultimate penalty, and these statutes are unconstitutional." p. 841.

My interpretation of the concurring opinions in Furman was obviously wrong, because the Supreme Court of the United States on July 2, 1976, ruled in Woodson v. North Carolina, 44 USLW 5267, that a "mandatory death sentence statute violates the Eighth and Fourteenth Amendments." However, it is of some small consolation to me that many eminent lawyers and jurists interpreted the five concurring opinions in the same manner that I did, and even Mr. Justice Rehnquist has recently said that determining the meaning of the concerns expressed in Furman is "not an easy task considering the glossolalial manner in which those concerns were expressed." Woodson v. North Carolina, 44 USLW 5267, 5278 (1976).

I think that I understand the constitutional positions on this subject enunciated by Mr. Justice Brennan and Mr. Justice Marshall; I also believe that I understand the constitutional positions enunciated by the Chief Justice, Mr. Justice Blackmun, and Mr. Justice Rehnquist; but I am wholly unable to understand the constitutional positions set forth by Mr. Justice Stewart, Mr. Justice White, Mr. Justice Powell, and Mr. Justice Stevens in their respective opinions in Furman, Gregg, and

Woodson. I have therefore abandoned any attempt to establish my own personal position on this subject on a construction of the Federal Constitution as construed by the present membership of the Supreme Court of the United States. I hereby establish my position on this subject solely on provisions of the Constitution of Georgia.

As late as 1964 the Supreme Court of Georgia ruled in *Sims v. Balkcom,* 220 Ga. 7 (136 SE2d 766) (1964), that the imposition of the penalty of death in a forcible rape case, homicide not being involved, was not "cruel and unusual punishment" as proscribed by the Eighth Amendment and its equivalent in the Georgia Constitution. This court said in that case: "So long as the legislature provides the death penalty for any crime, this court will uphold it for forcible rape, as there can be no more reprehensible crime. Accordingly the sentence of death violates neither of the Constitutions as contended." p. 11.

Ten years later in *Coley v. State,* supra, a majority of the membership of this court held that the imposition of the death penalty in a forcible rape case was excessive even though the Georgia legislature had provided for such a penalty and even though the jury that heard the case had imposed the death penalty on the convicted rapist. In *Coley* the majority said: "We, therefore, conclude the death penalty here imposed is excessive and have no alternative, under the language of the statute itself, except to set aside the sentence of death in this case." p. 835. Two members of this court held that the imposition of the death penalty in *Coley* was not excessive. I concurred in the setting aside of the death penalty in *Coley* on the ground that it was constitutionally impermissible under Georgia's "discretionary system" to impose that penalty.

Because the legislature had authorized the death penalty under statutes held by the majority to be constitutional, and because the jury hearing the case had imposed the death penalty under statutes held by the majority to be constitutional, I can only conclude that the majority held the imposition of the penalty to be excessive and unconstitutional in that case for the simple reason that it constituted "cruel and unusual punishment" under either the Georgia Constitution or the United States

Constitution or both.

A majority of the membership of this court has also held that the imposition of the death penalty in mere armed robbery cases, a homicide not being involved, is excessive and unconstitutional. *Gregg v. State,* 233 Ga. 117, 127 (210 SE2d 659) (1974).

This court has, therefore, held, as I read the majority decisions in *Coley* and *Gregg,* that the imposition of the death penalty in these two stated instances, although authorized by statute and imposed by a jury, is excessive and unconstitutional.

Because I am of the view that Georgia's current system for imposing the death penalty is purely discretionary with the jury that votes to impose or not impose that penalty, the present system collides with the Georgia constitutional provision that prohibits the imposition of "cruel and unusual punishment" upon a convicted citizen. I realize that a plurality of the membership of the Supreme Court of the United States has held that the "discretion" of the jury in the Georgia system is channeled: "No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in Furman are not present to any significant degree in the Georgia procedure applied here." Gregg v. Georgia, 44 USLW 5246.

I respectfully disagree with Mr. Justice Stewart, Mr. Justice Powell, and Mr. Justice Stevens. My experience in reviewing cases tried under the current Georgia system convinces me that a jury's discretion is not channeled, and a Georgia jury can "at its whim" impose or not impose the death penalty in any case wherein the statutes say it can be imposed and where the statutory aggravating circumstances are found to be present and unrefuted. Furthermore, my experience also teaches me that a majority of the membership of this court can "at its whim" allow a death penalty to stand or set it aside as excessive and unconstitutional.

I am personally unable to subscribe to any such system myself on constitutional grounds. Prior to July 2,

1976, I had thought that a "mandatory system" for the imposition of the death penalty, such as that conceived by North Carolina, Louisiana, and Oklahoma after Furman, would pass constitutional muster, both state and federal. However, a plurality of three members of the United States Supreme Court say that a "mandatory system" violates the Federal Constitution and two members of the United States Supreme Court hold that any system for imposing the death penalty violates the Federal Constitution. Therefore, the "mandatory system" that would receive my constitutional approval gets constitutionally convicted on federal grounds for differing reasons in the Supreme Court of the United States as that court is currently constituted.

I think Georgia's current system for imposing the death penalty is unconstitutional, because it violates the Georgia Constitution. Code Ann. § 2-109.

Trial by an Impartial Jury

Georgia's Constitution also provides that an accused citizen is entitled to "trial by an impartial jury." Code Ann. § 2-105. Georgia law currently provides that a juror who is unalterably opposed to the imposition of the death penalty is ineligible to serve as a juror in a capital case. Such a juror is automatically excluded from the jury by the trial judge "for cause." See Code Ann. § 59-806 (4) and *Eberheart v. State,* 232 Ga. 247 (206 SE2d 12) (1974).

In a "discretionary system," such as I consider Georgia's current system to be, the automatic exclusion of jurors from serving in the trial of a capital case deprives the accused citizen of an "impartial jury" as mandated by the Georgia Constitution.

In my separate opinion in *Eberheart,* supra, I said that the "exclusion of the jurors for cause was erroneous, and such exclusion would require the grant of a new trial. See Peters v. Kiff, 407 U. S. 493 (92 SC 2163, 33 LE2d 83) (1972), and Prof. White's law review article, The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries, 58 Cornell L. Rev. 1176 (July, 1973)."

A juror who strongly and mightily believes in the imposition of the death penalty in capital cases is just as partial in a capital case as is a juror who is unalterably

opposed to the imposition of the death penalty in a capital case. If one is automatically excluded by law from serving in such a case, it is my view that the other should also be automatically excluded. Georgia's "discretionary system," coupled with the automatic exclusion from jury service in capital cases of non-capital-punishment-oriented-jurors, guarantees that the state will have a jury partial to it during the guilty or not guilty phase of the trial and during the discretionary sentencing phase of the trial.

Georgia juries in capital cases, because of this mandatory and automatic exclusion from jury service, do not, in my opinion, reflect the conscience of the community, and such juries do not constitute a representative cross section of the community population that is constitutionally required for the determination of guilt or innocence and for determination of the sentence to be imposed in the event of conviction. I think the Georgia system with this built-in automatic exclusion of jurors violates the "impartial jury" provision of the Georgia Constitution (Code Ann. § 2-105) and the "due process" provision in the Georgia Constitution (Code Ann. § 2-103).

On December 22, 1975, the Supreme Judicial Court of Massachusetts held a death penalty statute unconstitutional on state-law grounds without respect to federal constitutional law and the construction placed on the Federal Constitution by the Supreme Court of the United States. Commonwealth v. O'Neal, 339 NE2d 676 (Mass.) (1975). That court held that the statute under review violated the Massachusetts Declaration of Rights and was unconstitutional.

For the reasons stated in this dissenting opinion, I would hold that the current Georgia system for imposing the death penalty violates three specific provisions of the Georgia Constitution, Code Ann. §§ 2-103, 2-105, and 2-109.

I respectfully dissent.